# PLAINTIFF'S EXHIBIT 1

## The Andela Consulting Group, Inc.
## 18783 Tribune Street
## Northridge, CA 91326

**Thomas A. Tarter**
**Managing Director**
**Expert Witness – Banking and Credit**
**Consulting – Financial and Management**

**Phone: (818) 380-3102**
**Cell: (818) 414-6685**
**E-Mail: ttarter@earthlink.net**
**Web: www.andelaconsulting.com**

# EXPERT REPORT

**Christopher Shepard,**

**vs**

**Equifax Information Services, LLC, et al.**

**Case No:  2:17-cv-01118-KJM-CKD**

**United States District Court**

**Eastern District of California**

**March 8, 2018**

**Prepared By**

# Thomas A. Tarter

## TABLE OF CONTENTS

**EXECUTIVE SUMMARY** .................................................................................3

**INTRODUCTION** .........................................................................................3

**QUALIFICATIONS** .......................................................................................5

**DOCUMENTS** .............................................................................................7

**SCOPE OF ENGAGEMENT** ...........................................................................8

**DISCUSSION, OBSERVATIONS AND OPINIONS** ............................................9

    **Factual Assumptions and Chronology** ......................................................9
    **Preface** ...........................................................................................11
    **The Credit Process** ...........................................................................11
    **The Dispute Resolution Process** ............................................................15
    **Credit Damage Overview** ...................................................................16
    **Equifax and Equifax's Financial Condition** ............................................17
    **Good Credit is Important and Benefits Consumers and Businesses** ...............17
    **The Validity of Information is a Credit Industry Standard** .........................18
    **Time, Energy and Money Needed to Remedy Negative Credit Information** ...........20
    **Credit Expectancy is Adversely Impacted by Negative Credit Information** ...........20
    **Credit Scoring** .................................................................................21
    **Observations and Opinions** ................................................................22

**CONCLUSIONS** .........................................................................................29

**SUPPLEMENTAL INFORMATION** ................................................................30

    **Exhibit A – Thomas Tarter's CV and an Andela Overview**

    **Exhibit B – Thomas Tarter's Case Log for Arbitration. Deposition, Mediation and Trial**

    **Exhibit C – CFPB Credit Report Dispute Chart**

## EXPERT REPORT OF THOMAS A. TARTER

### EXECUTIVE SUMMARY

1. As a Credit Reporting Agency ("CRA"), Equifax acted as a gatekeeper for consumers, like Mr. Shepard, to qualify for credit, insurance, employment, business and investment opportunities.
2. Equifax did not conduct a commercially reasonable investigation and/or re-investigation of Mr. Shepard's DCI disputes.
3. It was commercially reasonable for Equifax to foresee that a failure to conduct a commercially reasonable dispute investigation and/or re-investigation would damage Mr. Shepard.
4. Illustrative of the importance of information reported by CRAs, is the following excerpt from Mr. Ulzheimer's book, "You're Nothing but a Number, Why achieving great credit scores should be on your list of wealth building strategies":

   > **"Whatever your reason, it really doesn't matter. What matters is that you should care and you should care a lot. You simply cannot avoid the influence of credit reporting and credit scoring. No matter how hard you try, you're in the system and will be in the system until you die. Remember what I said in the introduction. The most powerful companies in America are the ones that preside over your life by maintaining your credit." p. 16-17.**

### INTRODUCTION

I have been retained on behalf of Christopher Shepard (sometimes "Mr. Shepard" or "Plaintiff") through his counsel, Sinnett Law, APC. to provide consulting, and if necessary, expert witness testimony in the form of a declaration, report and/or verbal testimony at deposition and/or trial inclusive of rebuttal testimony, pertaining to banking and credit industry customs, standards and practices; credit reporting; credit scoring; and credit damages caused by Equifax Information Services, LLC. (sometimes "Equifax") and Diversified Consultants, Inc. (sometimes "DCI").

In connection with this engagement, I have prepared this Report and, to assist readers, a table of contents.

3

The opinions expressed in this Report are based upon my knowledge and experience developed throughout my more than 45-year career in banking, business, credit, debt collection and consulting, as well as my research and information that has been provided to me by Plaintiff's counsel.

Consistent with my practice, this Report is subject to amendment, modification and supplementation upon any information, facts, documents or testimony that may be provided to me in the future.

**QUALIFICATIONS:**

I am the Managing Director of The Andela Consulting Group, Inc. ("ACG") and I have significant experience in banking, business and consulting inclusive of experience in connection with consumer credit, credit repair, credit scoring, debt collection, loan servicing and credit damage computation.

I have served as a court approved financial advisor, management consultant, business advisor and on the boards of directors of public, financially troubled and closely held corporations (large and small) including SEC reporting corporations such as Bank of Los Angeles, United Mortgage, First Alliance Mortgage Company ("FAMCO") to whose board I was appointed to serve as an independent outside director subsequent to its bankruptcy filing as well as American Standard Development Company (real estate development) and Sunshine Makers, Inc. (dba Simple Green).

My experience, as expressed in this Report, in the banking, business, consulting, credit, and financial service company industries spans more than 45 years inclusive of my direct experience in connection with the matters set forth in this Report.

Following my enlistment and service in the United States Army (1965-1968) which included service as a Finance and Accounting Officer, I started my banking career at Lloyds Bank California, where I was a Vice President in the Corporate Finance and California Divisions; and continued it at the Sanwa Bank of California, as Vice President and the Senior Credit Officer for Southern California; Bank of Los Angeles, as Founding Director, President and Chief Executive Officer; Center National Bank, as Director, President and Chief Executive Officer; First Los Angeles Bank, as Executive Vice President; Western States Bankcard Association, as a director and ACG. I was also a director of the Fort Ord Credit Union, advisor to Matadors Community Credit Union and a founder and organizer of Hancock Savings Bank.

My work with financial institutions and financial service companies, lenders, ACG and my consulting experience includes consumer credit, secured lending, debt and loan collection and credit reporting, credit scoring and loan approval models, credit damage computation and dispute resolution.

As a prior financial institution officer, senior executive and board of directors' member, I have considerable experience in consumer credit related issues such as those involved in this matter. Since 1993, I have advised ACG's clients and served as a litigation consultant regarding the above subject matters.  I have testified in state and federal courts including but not limited to Arizona, California, Connecticut, Illinois, Massachusetts, Nevada, Oregon, Pennsylvania, Rhode Island, Texas, Utah, Virginia, Washington, West Virginia and U.S. Territories of Guam and Saipan.

I have been appointed to and have served on the mediation panel (1995 to the present) for the Bankruptcy Mediation Program of the United States Bankruptcy Court for the Central District of California and have mediated consumer credit disputes.  In addition, I was a multi-term member of the Board of the Los Angeles Bankruptcy Forum.

I have a Master of Business Administration degree from the University of Santa Clara and a Bachelor of Science degree in business from the University of California at Los Angeles.

A copy of my resume and an overview of The Andela Consulting Group, Inc. are attached as Exhibit A.  Also, attached as Exhibit B is a case log involving testimony in arbitration, deposition, mediation and trial.

**DOCUMENTS**

In preparing this Report, I have reviewed numerous articles, websites and credit related information (collectively, the "Documents") including but not limited to the following:

- Complaint ("Complaint");
- Pleadings;
- Responses to Interrogatories and Requests for Admissions;
- Documents – SHEPARD-PLA 000001-228;
- Documents – EIS-SHEPARD 000001-217;
- DCI's website;
- TransUnion website;
- Experian website;
- Equifax website;
- Credit Karma website;
- Federal Reserve Bank website;
- FICO website;
- CDIA: Credit Reporting Resource Guide (2015)
- Union Bank of California, Lender Liability Guidelines;
- Risk Management Association Code of Ethics;
- Fair Credit Reporting Manual, National Consumer Law Center;
- Fair Debt Collection Manual, National Consumer Law Center;
- The Cost of Credit Manual, National Consumer Law Center;
- Credit Scores and Credit Reports, Evan Hendricks;
- Consumer Financial Protection Bureau ("CFPB") Report, Supervisory Highlights Consumer Reporting Special Edition, Issue 14, Winter 2017 sometimes the "CFPB CRA Report");
- FTC website;
- CFPB website;

7

- Economic/Hedonic Damages, The Practice Book for Plaintiffs and Defense Attorneys, Michael L, Brookshire, Ph.D. and Stan V. Smith, PhD, 6th Printing ("Economic/Hedonic Damages");
- Analyzing Financial Statements, American Institute of Banking and American Bankers Association;
- The Laws of Money, Suze Orman;
- You're Nothing But a Number, John R. Ulzheimer, Credit.com;
- Your Credit Score, Your Money & What's at Stake, How to Improve the 3-Digit That Shapes Your Financial Future, Liz Pulliam Weston, FT Press;
- Footnoted and textual references.

During my banking, business, financial institution and consulting career, in addition to what I have learned from my professional work experience, I have attended numerous seminars, conferences and courses. I have studied various textbooks and read professional and trade publications. The subject matters covered by these materials include: business, corporate governance, credit, credit damages, economic trends, financial services industries and consulting issues. While the sources for these materials may vary, they are sponsored or published by various organizations closely associated with business, commercial and consumer credit, economics, insurance, lending and consumer credit organizations.

**SCOPE OF ENGAGEMENT**

I have been requested to address credit industry customs, standards and practices, credit reporting, credit scoring, and credit damages caused by negative credit reporting:

 a. Describe for the Court and jury's consideration credit industry customs, standards and practices for credit; the use of credit reports for consumer credit (such as: automobile loans, credit cards, mortgage loans); insurance; employment; business and investment; credit scoring models; and, damages resulting from furnishing and/or reporting inaccurate, negative credit information by a debt collector and/or credit reporting agency.

    b.   Describe and compute, to the extent commercially reasonable, credit damages arising from Equifaxs actions.

With respect to the Scope of my Engagement, at this stage of my engagement, I have not attempted to quantify damages.  Instead, I have identified categories of damage.  This does not mean that damages (economic and emotional) are not real given the importance of credit, lost credit, education, employment, loss of enjoyment of life and the impact oflosing important opportunities.

.

## DISCUSSION, OBSERVATIONS AND OPINIONS

*As discussed in this Report, I may use terms such as bad faith, breach, claim, conduct, good faith, fair dealing, liability, negligence, reckless, slander, willful, and other terms. In the context of this Report, I am not discussing or opining from a legal perspective, but rather from a business perspective and the use of such terms as they are commonly used in the ordinary course of business by business and credit industry professionals.*

*Additionally, as discussed in this Report, I may use terms such as emotional, stress and other terms.  In the context of this Report, I am not rendering psychological and/or medical opinion.  I do    not intend to quantify emotional and/or medical opinions but rather I am rendering opinions from a business and direct personal experience perspective that is based upon my personal and professional  meetings with hundreds of individuals involved in credit disputes and credit problems on a regular basis during the past 45-years.*

### Factual Assumptions and Chronological Information

1. While, DCI and Mr. Shepard have settled, Mr. Shepard and Equifax have not settled.
2. Mr. Shepard, was born in 1981; is engaged to be married; lives in Antelope, CA; and works for the California Statewide Law Enforcement Association.

3.  The debt DCI inacurately reported to Equifax was: Amount: $225, Balance: $225 Status: Unpaid, In Collections.

4.  Equifax is one of the "Big 3" CRAs with headquarters in Atlanta, GA.

5.  DCI is a debt collector located in Florida.

6.  Mr. Shepard **made or received phone calls** from Equifax on January 19, 2017, January 26, 2017, March 17, 2017, and May 24, 2017.

7.  Mr. Shepard communicated with Equifax **via the internet** on July 8, 2018, September 19, 2016, December 12, 2016, December 22, 2016, January 12, 2017, January 19, 2017, January 27, 2017, February 7, 2017, and May 24, 2017.

8.  Mr. Shepard has been denied credit including: a Chase credit card on or about September 27, 2016, January 27, 2017, and February 23, 2017,

9.  Mr. Shepard was unable to purchase a house and was informed by a mortgage broker that he could not qualify for a mortgage with the DCI account on his credit.

10. Mr. Shepard suffered emotional distress, loss of sleep, loss of appetite, nausea, diarrhea, and heart palpitations as a result Equifax's conduct. Plaintiff took over the counter medications to treat these harms.

11. Mr. Shepard disputed the inaccurate DCI tradeline information with Equifax approximately ten (10) times, many of which provided "proof of 0 balance."

12. Equifax failed to investigate Plaintiff's disputes or update the inaccurate DCI tradeline following three AUD's submitted from DCI. Lastly,

13. Mr. Shepard filed two (2) complaints against Equifax with the Consumer Financial Protection Bureau ("CFPB") and attached to both of those complaints were **DCI letters and statement from AT&T which showed a zero balance for the account.**

**Preface**

This case has inter-related components that involve but are just not limited to a credit furnisher (DCI); a CRA (Equifax); inaccurate reporting of a paid account; dispute investigations and re-investigations by DCI and Equifax; internal controls and systems; credit denial; credit scoring; and, slandering Mr. Shepard's credit profile.   Here, derogatory, negative information was double reported, investigations and re-investigations were not consistent with industry standards, and negative information was not timely deleted from Mr. Shepard's credit report.  All of which adds up to Mr. Shepard being damaged economically and emotionally.

Also, since Equifax may point-fingers at DCI, it is not my intention to ascribe liability between them, as that is the purview of the Court and jury.  Nonetheless, it is my opinion that Equifax has independent liability for its actions and/or inactions as discussed in this Report.

**The Credit Process**

Based upon my direct experience, education and training the extension of credit and risk management are both an art and a science. Historically, lenders have acknowledged that "to measure the exact extent of a given risk is rarely possible"[1].  The extension of credit and risk management is like an art because the benchmarks for risk adjustments vary and may be subjectively interpreted by creditors/investors for borrowing situations where the circumstances, collateral value, security, debt to income ratios, credit rating scores frequently are expressed in ranges.  For example, loan to value ratios are frequently expressed in ranges such as loan-to-value ratio ("LTV") ranges of 65% – 80% for first priority multifamily (apartment) properties; credit scores of 760+ for the top mortgage rate, 730-759 for the next level, etc.  Consequently, any credit risk measurement involves varying degrees of professional judgment, data interpolation, metrics and economic condition analytics.  Nonetheless, a key element in the credit process is information

---

1   Analyzing Financial Statements, American Institute of Banking and The American Bankers Association, Clifton Kreps and Edward Gee, Fourth Edition, p. 6.

contained in credit reports, especially payment history.   Here, Equifax's failure to accurately report Mr. Shepard's's trade line payment history was critically important and, **in my opinion, Equifax, either knew or should have known that if it violated industry standards, it was highly likely and foreseeable that its negligence and failure to act consistent with credit industry guidelines Mr. Shepard would be harmed (damaged).**

According to the **National Consumer Law Center's ("NCLC"2) treatise3**, "The FCRA defines a consumer report as bearing on a consumer's **credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living.** Since a report need bear on only one of these seven factors, virtually any information about a consumer satisfies this part of the definition of a consumer report. Thus, reports about renter's evictions, rental payment histories, or treatment of premises relate to character, general reputation, personal characteristics…."[4]

In **Section 2.3.4.1 of its manual** the NCLC states, "The FCRA provides that **consumer reports involve information 'used or expected to be used or collected in whole or in part for' various permissible purposes.  That is, if a reporting agency expects a user to use a report for a permissible purpose or if the agency collected the information in the report for a permissible purpose. The consumer need only show that a report meets one of these criteria: that the report was 'used', 'expected to be used' or 'collected' for a permissible purpose.** Thus, interpretation of the scope of the term consumer report not only tracks the statutory language, but is accepted by an overwhelming majority of courts and by the Federal Trade Commission."[5]

---

2 The NCLC headquartered in Boston, MA, the NCLC is an American non-profit corporation that publishes books and manuals pertaining to low-income consumers.  Staff members frequently testify before Senate and Congress Committees on issues such as ID theft, FCRA, FDCPA, mortgage and other issues.

3 Fair Credit Reporting Act Manual, Fourth Edition ("FCRA Manual").

4 FCRA Manual, pg. 44.

5 FCRA Manual, pg. 46.

And further, in **Section 2.3.4.3 of that same manual** with respect to the expected use of information, "If a **consumer reporting agency provides a report with the expectation that the report will be used for one of the statute's permissible purposes, the report is a consumer report under the Act; the ultimate use to which it is put is irrelevant. It is enough if one of the anticipated uses is covered by the FCRA, even if it is not the primary expected use.**

"While it is sufficient if the reporting agency anticipates a permitted use, this is not even necessary. The statutory language 'expected to be used' need not be limited to expectations by that particular agency in that particular transaction. **It should be enough if, in the usual course of events, one would expect that one of the uses of a report would be a permissible one."[6]**

It has been my direct experience that the credit process is an integrated series of events involving furnishers of credit information; CRAs; consumer awareness, personal, family and household needs and desires; consumer approval to obtain credit information; and risk assessment. Mr. Shepard identified a credit reporting error, which was not timely corrected.

It is my opinion that any Equifax finger-pointing towards DCI is not productive or relevant, because, independent and separate from DCI, Equifax was required to undertake commercially reasonable investigations of Mr. Shepard's disputes and, despite supporting documentation, it knowingly engaged in the creation, production and verification, on multiple occasions, of inaccurate, negative credit information concerning Mr. Shepard that "on its face" was glaringly inaccurate given the proof of payment and information Mr. Shepard gave Equifax..

---

6 FCRA Manual, pg. 47.

The conclusion that I drew was that Equifax, should have taken steps to prevent the issuance of demonstrably inaccurate information that purportedly related to DCI.

It has been my direct experience that consumers, like Mr. Shepard, rely upon accurate credit information (being provided by credit furnishers and reporters),  and that furnishing/reporting inaccurate information is not consistent with any CRA and/or credit industry standards.

The CFPB reported in its CRA Credit Process report:

> "**Credit reporting plays a critical role in consumers' financial lives**, a role that most consumers do not recognize because it is usually not very visible to them. Credit reports on a consumer's financial behavior can determine a consumer's eligibility for credit cards, car loans, and home mortgage loans – and they often affect how much a consumer is going to pay for that loan. **Federal law provides an important framework to ensure the players in the consumer reporting system receive the benefits of our risk-based credit economy.**

> "**We prioritized this market for oversight to promote our vision of a consumer reporting system: a system where furnishers provide and CRCs[7] maintain and distribute data that are accurate, supplemented by an effective and efficient dispute management and resolution process for consumers.** The CFPB's vision is rooted in the obligations and rights set forth in the Fair Credit Reporting Act (FCRA) and Regulation V.1 In the last two years, we identified failings in compliance management systems and violations of law both at CRCs and at furnishers.

> "As a result, we have directed specific improvements in data accuracy and dispute resolution at one or more CRCs, including:

>> • **stepped-up oversight of incoming data from furnishers**;
>> • **institution of quality control programs** of compiled consumer reports;
>> • **monitoring of furnisher dispute metrics to identify and correct root causes**;
>> • enhanced oversight of third-party public records service providers;
>> • **enforced independent obligation to reinvestigate consumer disputes, including review of relevant information provided by consumers**; and
>> • **improved communication to consumers of dispute results.**" **[Emphasis added]**

---

[7] "Credit Reporting Companies" as set forth in the CFPB report.

It is my opinion that Equifax was not compliant with CFPB's guidelines because, at the very least, the root cause of Mr. Shepard's negative credit information was demonstrably and obviously inaccurate based on the information he and DCI provided it and that the inaccurate information was not not detected by a quality control program at the reporter (Equifax) nor was it timely corrected by Equifax.

The CFPB has also reported that:

> "**following the initial reviews of accuracy programs, examiners found that one or more CRCs lacked quality control policies and procedures to test compiled consumer reports for accuracy**.(footnote 6 to the Report stated that in "CFPB, Supervisory Highlights, 2.1.2 (Summer 2015) (explaining that "[w]hile processes existed to analyze and improve the quality of incoming data, there was no post-compilation report review or sampling to test the accuracy of [compiled] consumer reports."). SUPERVISORY HIGHLIGHTS CONSUMER REPORTING SPECIAL EDITION (ISSUE 14) ". **[Emphasis added]**

Consequently, quality control programs to detect inaccurate consumer reporting of file data and systems designed to measure the accuracy of consumer reports is important and consistent with regulatory guidelines and credit industry standards.

Each time Mr. Shepard disputed DCI tradeline information on his consumer credit report, Equifax should have again conducted thorough investigations and corrected his information in their data base. The failure to timely do so, was reckless and willful because on numerous occasions Equifax ignored clear evidence of the problem, ignored obvious institutional knowledge that the problem existed, and caused an undue delay in allowing a consumer such as Mr. Shepard to obtain proper resolution of the issues he disputed and specifically identified.

**The Dispute Resolution Process**

The CFPB chart, attached as Exhibit C, illustrates the normal CRC dispute process.

A key element of the credit dispute process involves the use of supporting info as part of the investigation and re-investigation dispute resolution process.  Here, after Mr. Shepard disputed the initial negative report, Equifax reported a negative tradeline account. On multiple instances (at least 10) Mr. Shepard disputed the inaccurate negative reporting. Nonetheless, Equifax did not correct their records.

**Credit Damage Overview**

According to many of my credit industry peers, damages created by negative credit furnishing and negative credit reporting cause a large variety of adverse consequences for consumers (such as Mr. Shepard) that may include: missed investment opportunities such as being able to qualify for a credit card, qualify to purchase a home: higher borrowing costs; reduced credit availability; and, loss of enjoyment of life.  Consequently, it is my opinion that the negative credit information furnished and/or reported by Equifax, with a high degree of commercial certainty, damaged Mr. Shepard.

The importance of CRAs and the information that they maintain is reinforced by many credit professionals such as Evan Hendricks, Stan Smith, Phd and John Ulzheimer.  I have decided to include in this Report, as an illustration of the importance of information furnished to CRAs, the following excerpt from Mr. Ulzheimer's book, "You're Nothing but a Number, Why achieving great credit scores should be on your list of wealth building strategies":

> **"Whatever your reason, it really doesn't matter.  What matters is that you should care and you should care a lot.  You simply cannot avoid the influence of credit reporting and credit scoring.  No matter how hard you try, you're in the system and will be in the system until you die.  Remember what I said in the introduction.  The most powerful companies in America are the ones that preside over your life by maintaining your credit."  p. 16-17.**

**Equifax and Equifax's Financial Condition**

**Equifax** is one of the "Big 3" (Equifax, Experian and TransUnion) CRAs whose 2016 annual revenue was $3.145 Billion; its net income totaled $489 Million; and it had total equity of $2.662 Billion.

Equifax was founded in 1889 According to its Investor Relations website "Equifax powers the financial future of individuals and organizations around the world. Using the combined strength of unique trusted data, technology and innovative analytics, Equifax has grown from a consumer credit company into a leading provider of insights and knowledge that helps its customers make informed decisions. The company organizes, assimilates and analyzes data on more than 800 million consumers and more than 88 million businesses worldwide, and its databases include employee data contributed from more than 5,000 employers.

"Headquartered in Atlanta, Ga., Equifax operates or has investments in 21 countries in North America, Central and South America, Europe and the Asia Pacific region. It is a member of Standard & Poor's (S&P) 500® Index, and its common stock is traded on the New York Stock Exchange (NYSE) under the symbol EFX. Equifax employs approximately 9,200 employees worldwide."

**Good Credit is Important and Benefits Consumers**

Good credit and the absence of negative, duplicative trade-line information are important as illustrated by the following:

> **Federal Reserve Bank of San Francisco** has reported:

> "Credit is valuable. The amount of how much credit you have and how much you use it goes far beyond shopping. Whether you have good or poor credit can effect where you live and even where you work, because your credit record may be

considered by prospective employers.  That is why you need to understand how credit is awarded or denied and what you can do if you are treated unfairly."[8]

**TransUnion** (another Big 3 CRA) states the following:

"The Federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness and privacy of information in the files of consumer reporting agencies."

"**You make seek damage from violators**.  If a consumer reporting agency, or, in some cases a user of consumer reports or a furnisher of information to a consumer reporting agency violates FCRA you may be able to sue in State or Federal Court."[9] **[Emphasis added]**

In summary, (i) consumer credit monitoring, scores and credit reporting are huge industries; (ii) consumers pay billions to monitor and protect their credit from negative information; (iii) it is important for CRAs to have established and enforced policies and procedures to protect businesses and consumers; and (iv) if negative, inactivecredit was furnished and/or reported, consumers, such as Mr. Shepard, are harmed (damaged) **even if the negative information is subsequently deleted and not reported in the future because the "bell was rung" and adverse consequences resulted from Equifaxs actions and conduct.**  Consequently, negative, inaccurate trade-line information is detrimental to any affected consumer like Mr. Shepard.

**The Validity of Information is a Credit Industry Standard**

This case goes to the very core of credit because negative information was repeatedly reported on Mr. Shepard even after demonstrable and commercially reasonable evidence was provided to Equifax.

Consequently, it is my opinion that Equifax did not have established and enforced policies and procedures to detect and correct multiple errors.

---

8 Federal Reserve Bank of San Francisco, Consumer Information, Your Credit Life How the Law Protects You.
9 TransUnion, A Summary of Your Rights Under the Fair Credit Reporting Act.

In addition, it is my opinion that Equifax did not (given the demonstrable evidence of payment and a $0 balance conduct a commercially reasonable investigation or reinvestigation because if they had they should have easily determined the inaccurate reporting.   Consequently, if a reasonable investigative process had taken place, the inaccurate information should have been easily corrected by just looking at the information Mr. Shepard provided Equifax. Since this did not timely occur, Mr. Shepard was damaged.   Further, given the failure to timely correct the obvious erroneous information, it is my opinion that Equifax acted in reckless and willful disregard of the facts in the issuance credit information, reporting obvious inaccurate information, failing to timely make corrections and in their responses to Mr. Shepard.

For example, the guidelines of three credit industry trade associations serve as illustrations of industry standards regarding accuracy and validity: (i) the Debt Buyers Code of Ethics requires a verification of the validity of an obligation; (ii) the Risk Management Code of Ethics requires reporting accurate credit information; and (iii) "The Code of Ethics and Code of Operations of ACA International (The Association of Credit and Collection Professionals) requires that "we assume responsibility to…the public at large."; "Be fair and respectful to…the public and…in all business or professional relationships"; "Demanding the highest degree of ethical practices and conduct"; "Communicate with consumers with honesty and integrity".

Here, it is my opinion that Equifax did not comply with the: (i) public policy statement contained on its website; (ii) it did not timely resolve Mr. Shepard's DCI inaccurate tradeline account; (iii) it did not comply with credit industry standards: and (iv) it did not comply with the FCRA.   It is my opinion that Equifax engaged in Jekyll and Hyde behavior by projecting one image to the public and by acting totally different with respect to Mr. Shepard's dispute.

**Time, Energy and Money are Needed to Remedy Negative Credit Information**

Credit and financial issues often require a considerable expenditure of time, energy and money for a consumer to attempt to remedy a negative situation.  The credit damage remedy process, also takes a toll on the victims because of the effect that it has on the quality of their lives, their "loss of enjoyment of life", the loss of the ability of having a normal life including credit denial, slandered public image, delay in being able to purchase a home; and instead, their public and social image is tainted.  This happened to Mr. Shepard because he was turned down by (i) Chase for a credit card; (ii)  was informed he would not qualify for a mortgage to purchase a home; and he has reported suffering medical and emotional problems..  It is, therefore, my opinion that  Mr. Shepard was significantly impacted by Equifax's actions and conduct, with anguish, frustration, sense of stigmatization, being tainted, and sense of being victimized and being compelled to exercise his legal rights.

**Even though the negative DCI trade-lines were ultimately deleted, Mr. Shepard was forced to spend valuable time dealing with credit issues arising from Equifax's negative trade line furnishing and reporting.**

**Time is a valuable commodity[10].  Professionals place value on the time they spend working on behalf of a client by charging clients for their time.  There is a finite amount of time in each day and in each person's life.  Time cannot be replaced.**  The past can only be re-visited through memories, it cannot be undone.

**Credit Expectancy is Adversely Impacted by Negative Credit Information**

It has been my direct experience that a major result of credit damage is often the loss or reduction in credit expectancy (credit availability).  In fact, in a recent TV ad, Experian

---

10 An article in the Wall Street Journal focused on the value of time and cost of time benefits and trade-offs.  "put a Dollar Value on Your Time, With Help from New Tools", by Sue Snellenbarger, Wall Street Journal, Personal Journal Section, July 22, 2015, pg. D1.

reported that 90% of all credit decisions are based on credit information and credit scores. Based upon my experience, I found this to be true and I agree.

Further, Mr. Shepard is a classic example because he was turned down three times for credit by Chase who cited Equifax as being a factor in their decision making process. Consequently, it is my opinion that Equifax's failure to have established policies and procedures to detect obviously erroneous information resulted in Mr. Shepard being damaged.   Thus, even for obtaining a credit card, it was a problem because credit card companies rely on credit information from debt collectors and CRAs like DCI and Equifax. Mr. Shepard was clearly a victim because he was denied the capacity and mechanism necessary to obtain credit for personal, family or household purposes and his character and reputation were  slandered.

**Credit Scoring**

Credit score computations are heavily weighted to take into account payment histories and delinquent account information furnished to them, and data contained in public records, as illustrated below:

**Factor 1: Payment History (35%)**
- Track record with various lenders
- Length of Positive Credit History
- Length of Time that has Passed Since the Most Recent Negative Item
- Severe Unpaid Debts – Public Records
- Severity & Quantity of Delinquencies

**Factor 2: Amount Owed – Extent of Indebtedness (30%)**
- Quantity of Credit Accounts
- Ratio of Credit Balance to Credit Limit
- The amount owed on all accounts
- How Much is Owed On Each Type of Account?
- How Much of Mortgage or Other Installment Loans Are Paid Off?

21

**Factor 3: Length of Credit History (15%)**

- Overall Length of Credit History (In General)
- How long have specific credit accounts been established?
- How long has it been since you used certain accounts?

**Factor 4: How Much New Credit Are You Assuming? (10%)**

- How many new accounts, particularly credit card accounts?
- How long has it been since you opened a new account?
- How many recent requests for credit have you made, as indicated by inquiries to the credit bureaus?
- Length of time since credit report inquiries were made by lenders
- Whether you have a good recent credit history, following past payment problems
- **Factor 5: Inquiries (10%)**

As a consumer's credit profile gets stronger with no negative information, consumers become a better credit risk candidate for credit providers, and therefore, the lender (credit grantor) asks for less interest as compensation for letting the consumer use credit to pay for services and/or to use its money to extend loans for credit cards and mortgages.

However, in the case of Mr. Shepard, he was denied credit because credit providers determined, based on information contained in the Equifax report that contained the DCI negative inaccurate tradeline account, that he did not qualify or meet their credit criteria at any price.

**Observations and Opinions**

Based upon my review of the aforementioned Documents, and my own more than 45-years of banking, board, business and consulting experience, I have formulated the observations and opinions expressed below and in this Report:

1.  I am noting for the record that although the Equifax may point fingers at DCI, I have not attempted to apportion or ascribe liability between them as that, in my opinion, is the role of the Court and the jury.

2.  I also note for the record, at the outset, that the facts and circumstances of each consumer's credit damage from adverse, false negative credit information is distinct.

3.  As to damage quantification, I have not made any computations for reasons expressed in this Report.

4.  The impact on Mr. Shepard of the Equifax's adverse, false and inaccurate DCI trade line information that was reported is significant because consumer credit is an important factor in the daily business - consumer economic cycle, because it provides a means of payment for the purchase of goods and/or services (such as for personal family or household purposes at retailers like Target or even to purchase a home).  Credit comes in many forms such as mortgages, credit cards, and not having the fear of credit denial and possibly being "chilled" from applying for credit cards (even to obtain significant promotional discounts at mass retailers like JC Penney) because of wanting to not be embarrassed by being turned down at the register.

5.  The false, inaccurate, negative DCI account trade line information reported by Equifax, caused me to conclude that the Equifax did not have established and enforced policies and procedures to determine the accuracy and/or the validity of the credit information that they reported to credit grantors (like Chase, mortgage brokers and others) nor did Equifax have adequate established and enforced policies and procedures in responding to Mr. Shepard's written credit dispute communications.

6.  It has been my experience that consumer credit providers normally have well-defined policies, procedures and systems such as automated credit decision models that are used in their credit decision making process.  Negative credit events, such as recent negative reporting and negative collection remarks are events that may individually and/or collectively cause a credit request to be turned down.  And, in the event of approval, be a commercially reasonable reason to impose higher rates, fees, lower amount of credit availability, and more stringent terms and conditions.

7.  Consumers, like Mr. Shepard, depend upon credit bureaus to provide accurate credit information, as well as on creditors who base their consumer credit decisions substantially[11] on credit information provided by companies like Equifax.  Here, Equifax's reported and failed to thoroughly investigate and then re-investigate adverse, false and inaccurate negative credit information that caused Mr. Shepard to be turned down for credit, delay in purchasing a home and slandered his reputation by reporting false, adverse and derogatory information to potential creditors. It is also my opinion that Equifax's actions and conduct was abusive, oppressive, reckless, willful and callous.

8.  Additionally, the Equifax's negative collection account reporting also consumed time[12] that could have been used to improve the quality of Mr. Shepard's life with his family, friends and others.  It is my opinion that this is a huge damage that was a direct result of Equifax.

9.  Creditors and major retailers who have "private label" credit relationships with credit issuers like Chase, Citibank, Discover, Ford, HSBC, Home Depot, Target, J.C. Penney, Best Buy are major participants in the credit industry because of their size, business specialization, business relationships in the financial services industry, desire to sell products and because they either furnish credit

---

11  Financial models using information provided by CRAs is commonly used in the ordinary course of business by banks, major retailers, credit card companies and auto dealers.
12  For example: resolving credit problems as well as litigation effectively becomes a job.

information and/or use reported information to make credit decisions. Consequently, if the information communicated is negative multiple parties may be damaged including but not limited to people like Mr. Shepard and others similarly situated; as well as, creditors' missed sales opportunities[13]. Specifically, Mr. Shepard was denied credit by Chase, a mortgage broker as well as being delayed in purchasing a home. This is an example of everyone losing.

10. Consumers, like Mr. Shepard, who work very hard to improve the quality of their life are impacted directly by negative credit which creates a "roadblock" and directly affects their ability to obtain and maintain credit and improve the quality of their life. In essence, negative credit data is an indicator of potential problems that may impact a person's ability and/or willingness to repay. That impression was directly opposite the achievements (such as being able to move out of an apartment and be able to purchase a home) Mr. Shepard was working very hard to accomplish. It has been my direct experience that many bankers view negative credit information and collection accounts as being a "character flaw" because basic credit training programs focus on the 5 C's of credit[14] with character being the most important. In this regard, mortgage lenders and credit card issuers frequently download CRA generated information into their credit decision making models.

11. Other damages from negative information are illustrated in one of my credit damage peer's approach to credit damage computation, included in the documents that I used in this action was the text, Credit Scores & Credit Reports, How The System Really Works, What You Can Do, by Evan Hendricks, First Edition, 2004, Privacy Times, Inc., ISBN 0-9645486-1-5. Please note that relative to damages cited by Mr. Hendricks are eight (8) categories of typical damages that include the following:

---

13  For instance the parties involved in the origination of a home purchase such as the RE salesperson.
14  Analyzing Financial Statements, American Bankers Association – Character, Capital, Capacity, Collateral and Conditions.

"Some Categories of Typical Damages/Costs:

    (1)    Inaccurately described as deadbeat to third parties;

    (2)    Improperly denied credit because of inaccurate data;

    (3)    Expended time and energy to correct errors not of one's making;

    (4)    Wrongfully received debt collection calls;

    (5)    Chilled from applying for credit;

    (6)    Sleeplessness, physical symptoms;

    (7)    Sense of helplessness, loss of control over personal data;

    (8)    The emotional distress stemming from, and associated, with all of the above.

"I [Evan Hendricks] propose a formula that takes into account the following factors.

**"FACTORS**

    (1)    The nature and substance of the category of damage

    (2)    Time & energy to solve the immediate problem

    (3)    The expectation that the problem was solved

    (4)    The number of recurrences

    (5)    The period of time over which the problem persists"

"In essence, the formula, like a credit scoring model, would need to 'assign weights or points' to each factor and then multiply Factor (1) by Factor (2); then that result would be multiplied by Factor (3), and then by Factor (4). Etc.  The purpose is to measure the compounding nature of the damage."[15]

12. It is my opinion that Mr. Shepard was damaged in multiple ways including but not limited to the following categories:

    Credit - Financial Stigma;

    Credit Denials

    Loss of Credit Expectancy[16];

    Loss of Quality of Life

    Time and Energy;

    Medical;

    Sleeplessness and Stress;

    Mental anguish, frustration and upset[17];

    Sense of helplessness, loss of control ;

    Legal Expenses.

13. In essence, it has been my direct experience that an individual's credit report is like a litmus test, a report card or bond rating.  Negative credit information

---

15  Credit Scores and Credit Reports, Evan Hendricks.

16  This represents an estimated range of available credit such as increased credit card costs as well as the loss of promotional rates that normally occur at Best Buy. Hypothetically, a 10% increase in credit card interest rates assuming an average outstanding balance of $2,000 would be approximately $200 per year. It is not possible in this case to quantify this element of damages.

17   Please refer to the sections of this report that cite Mr. Hendricks commentary.

created by a debt collector furnishing negative trade line information to a CRA and a CRA failing to correct demonstrable obviously inaccurate negative tradeline information directly leads to lower ratings (credit scores) and like businesses (debt ratings by rating agencies) this can result in the denial of credit that as a consequence has a significant direct adverse effect on a consumer, like Mr. Shepard. That is exactly what happened here.

14. Credit - financial[18] stigma represents a blemish or "black mark"[19] on a consumer's record caused by negative credit data. Credit - financial stigma's impact includes but is not limited to: (i) not being able to negotiate the "best credit terms"; (ii) not being able to qualify for credit; and, (iii) not being able to improve the quality of their life.

15. Credit-financial stigma is real and it is an ugly bi-product of negative credit. It has been my direct experience that negative credit information and facts concerning a person can directly lead to a scenario that consumes time and often creates a "downward spiral" that impacts the personal affairs and lives of individuals like Mr. Shepard. The inability to access credit, which otherwise would have been available, can directly cause a downward personal spiral such as being denied credit and an unnecessary delay in being able to purchase a home. The false, inaccurate negative trade line information caused by Equifax's negative trade line credit reporting created a stigma and adversely impacted Mr. Shepard's life.

16. It has been my direct experience that credit and financial difficulties may be compared to a variety of difficult situations. They are stressful, frustrating and time consuming. Further, once negative events take place, people are not often ever able to get back to 100%. Their quality of life enjoyment is diminished during the period of the events as well as residual future effects.

---

18  Avoiding the stigma and financial fallout of Chilling.
19  Stigma is defined as a blemish, blot, tarnish at Dictionary.com.

17. During my banking, business and consulting career, I have met with hundreds of consumers and it has been my direct experience that consumers like Mr. Shepard are often emotionally damaged by the stress, time and negative information reported in credit reports.  Based on my experience (not an opinion, since I am not a psychologist) Mr. Shepard was significantly damaged by the Equifax's furnishing, reporting and failure to timely correct obviously erroneous collection information.

18. Further, in my opinion, financial service company liability is triggered if the CRA adopts a course of conduct involving false and inaccurate statements; failure to act consistent with industry practices; not having established and enforced error detection systems relating to investigating and re-investigating disputed trade lines; non-compliance with regulatory authority and industry guidelines, regulations and laws, such as the actions and conduct of the Equifax in this case to timely investigate and/or re-investigate and then to correct the error because such conduct places a consumer, like Mr. Shepard, in a precarious position, interferes with the normal credit process and damages the consumer.

19. **Just like the advertising term "Priceless" used by MasterCard as to the value of a credit card, good credit is "Priceless"**.   However, not every element of a consumer's credit damages can have a "price tag" placed on them, especially with respect to mental health.   I am mindful that with respect to emotional damages, Justice Scalia commented that "that doesn't mean it's not actual. It just means that it's hard to quantify, but you've had the emotional harm.  Why isn't that an …actual harm."[20]

---

20 Justice Antonin Scalia, Oral Argument, Doe v. Chao, (Dec 2003), Credit Scores and Credit Reports, How the System Really Works, What You Can Do, Evan Hendricks, pg. 311, Chapter 20, Damage and Damages.

**CONCLUSIONS**

Based on the information that I have reviewed, at this point in time, I have concluded that:

- Equifax violated credit industry standards by reporting, not timely correcting, investigating, re-investigating and verifying false negative trade line information.

- Equifax did not have established and/or enforced policies and procedures to detect obvious inaccurate data information it was receiving from DCI and reporting to its clients.

- Equifax did not conduct a commercially reasonable investigation or re-investigation of Mr. Shepard's account dispute and did not timely correct his credit file.

- Equifax acted in a reckless and willful manner by not timely correcting Mr. Shepard's credit information.

- Mr. Shepard's credit damages included but were not just limited to:
    - Turned down in an attempt to obtain credit from Chase and qualify for a mortgage to purchase a home;
    - Slandered reputation and credit profile;
    - Delay in his ability to purchase a home;
    - Loss of enjoyment of life;
    - Credit Stigma;
    - Chilled from applying for credit;
    - Anxiety, sleeplessness, fear and sense of helplessness; and,
    - Expenditure of time and energy.

**SUPPLEMENTAL INFORMATION:**

Compensation:

| | |
|---|---|
| $295/hr | Consulting, preparation of declarations and/or reports and travel time. |
| $450/hr | Deposition and/or trial appearances involving testimony. |

Articles and Publications:

None in past 10 years

**Attached documents include:**

**Exhibit A - CV and Andela Overview;**
**Exhibit B - Case Log – depo and trial.**

# EXHIBIT A

**Andela and Tarter Background Information:**

**See Attached:**
**Andela Overview**
**Thomas Tarter's Resume**
**Addendum to ThomasTarter's Resume**

# The Andela Consulting Group, Inc.
### 18783 Tribune Street
### Northridge, CA 91326

**Thomas A. Tarter, Managing Director**                    Telephone:(818) 414-6685
**Expert Witness - Banking**
**Consulting - Financial and Management**             E-Mail: **ttarter@earthlink.net**
                                                       Website:andelaconsulting.com


The Andela Consulting Group, Inc. ("Andela Consulting"), managed by Thomas A. Tarter, engages in banking, credit (commercial and consumer), credit damage Expert Witness/Litigation Support.  Andela Consulting has provided business reorganization, management and financial advice to financial institutions and businesses.  With more than 40-years of experience as a banker, business owner and a consultant, Mr. Tarter brings to Andela Consulting's clients extensive knowledge on how businesses, banks and financial service companies operate.

Andela Consulting has been involved in many matters which include: retention by regulatory agencies, financial institution reorganization, banking, court approved independent directorships, cash controls and management, checking accounts, electronic funds transfer, consumer credit (credit cards, car financing debt collection,  embezzlements, FCRA, FDCPA, loan origination, loan mods, foreclosures and repos, credit damages, Ponzi schemes, consumer and commercial real estate lending, including land acquisition and development, bankruptcy plan interest rate and plan feasibility analysis, development and construction loans, corporate lending, corporate governance, loan servicing, lender liability issues, letters of credit, loan commitments, bank and guaranty demands, loan transactions, consumer loans and shareholder and insider matters, internal audit, banking Regulations and Compliance matters.

Andela Consulting was formed in 1993 and since that time its associates have worked with many types of clients in a variety of areas.  These include: (i) Sunshine Makers, Inc. d/b/a Simple Green to serve as an independent director; (ii) Marin Outdoor, appointed as a director in connection with its financial restructuring and Chapter 11 proceedings;  (iii) Oswell Self Storage to provide turnaround management and advisory services to a Chapter 11 debtor; (iv) A California Bank to provide litigation consultation regarding lending industry customs, standards and practices involving loan commitments; (v) Retained by the FDIC as receiver in multiple cases involving appraisal, construction lending, guaranty, loan origination and underwriting issues; (vi) A large Nevada Real Estate Development Company to provide turnaround management and financial advice; (vii) Advanta National Bank - expert testimony and litigation consultation regarding credit card collection practices pertaining to business related credit card usage; (viii) Consumer credit - TILA, loan and lease transactions, credit damages; (ix) Fifth Third Bank Overdraft "high to low sorting" litigation; (x) Numerous Loan Modification cases; (xi) Numerous Class Action cases involving Loan Servicing issues; (xii) Auto financing and leasing; (xiii) A Viatical Service Company to provide expert testimony and litigation consultation regarding asset-based lending industry customs, standards and practices and lender liability issues; (xiv) A Financial Institution to provide expert testimony and litigation consultation regarding real estate loan restructuring, construction and permanent lending; (xv) Credit damage analysis – consumer credit arising from credit reporting errors;  (xvi) Developed a cash management and control system for multiple inter-related Chapter 11 debtors operating in several states including Hawaii; (xvii) Developed court approved business rehabilitation and

marketing plans for a troubled bank; (xviii) Appointed to the board of directors of First Alliance Mortgage Company, as an independent, outside director, after the company filed for bankruptcy protection; (xix) Numerous bankruptcy plan related interest rate computations and plan feasibility analysis; and (xx) Numerous cases involving embezzlement, forgery and endorsement issues.

# THOMAS A. TARTER
## CURRICULUM VITAE
**The Andela Consulting Group, Inc.**
**18783 Tribune Street**
**Northridge, CA 91326**
Telephone: (818) 414-6685
E-Mail: **ttarter@earthlink.net**

## EDUCATION:

University of California at Los Angeles, Bachelor of Science degree in Business, 1965.

University of Santa Clara, Master of Business Administration degree with a Specialization in Finance, 1969.

## LECTURER:

Mr. Tarter has been an instructor, panelist and guest lecturer for several professional organizations and institutions of higher education, including the following:

>American Institute of Banking
>American Management Association
>Los Angeles City College
>United States Small Business Administration
>Gonzaga University School of Law
>Practicing Law Institute
>International Institute of Business and Banking
>Orange County Bankruptcy Forum
>Los Angeles Chapter of the American Society of Appraisers
>Southern California Chapter of the Appraisal Institute

## PROFESSIONAL EXPERIENCE:

September 1993 – Present
**The Andela Consulting Group, Inc.**, Managing Director
Provides expert witness, management, financial, and advisory services involving corporate governance, commercial and consumer credit, credit damages, credit cards, deposit accounts, management, court approved directorships, court approved financial advisor and financial institution matters.

Mr. Tarter has served on boards, assisted in corporate restructures, and has provided advisory services to a diverse group of clients including corporations, law firms, banks, financial institutions and governmental agencies, including the the FDIC, as Receiver.

Thomas A. Tarter CV

Page 2


October 1985 – August 1993

**First Los Angeles Bank,** Executive Vice President, Member of Officers Loan Committee

During his association with First Los Angeles Bank, Mr. Tarter was responsible for supervising the bank's largest banking region and was involved in developing compensation and incentive programs, asset/liability management, development of policies and procedures (deposit, operations and credit) and strategic planning.  Additional responsibilities included marketing, public relations, mergers, acquisitions, the development of non-traditional banking businesses, such as a mortgage banking division and an SBA loan department.


November 1984 – September 1985

**Center National Bank**, Director, President and Chief Executive Officer

Recruited  to administer a troubled financial institution.  Developed  programs to implement regulatory requirements and to constrict the bank's assets to adhere to capital constraints. Developed and implemented policies and procedures involving credit administration, operations, risk management and personnel including compensation, termination, staff curtailment and recruitment.


January 1980 – October 1984

**Bank of Los Angeles**, Organizer, Founding Director, President and Chief Executive Officer

Responsible for organization and completion of two stock offerings,  initial (1982) and secondary (1984), both of which were over subscribed.  Responsible  for the initial and ongoing organization of the bank, as well as supervising its operations and growth. Negotiated  the acquisition of the American City Bank - Beverly Hills from the Federal Deposit Insurance Corporation.  Developed and implemented policies and procedures including compensation, personnel, credit and audit.


1977 – 1980

**First Los Angeles Bank**, Regional Vice President and member of the bank's Officers Loan Committee


1976 – 1977

**Sanwa Bank of California**,  Vice President and Senior Credit Officer for Southern California and Member of Loan Committee.

Responsible for administering the bank's loan portfolio in Southern California, including the implementation of policies, procedures and controls to monitor the bank's corporate, real estate, consumer loan activities and its operations risk management systems.

Thomas A. Tarter CV

Page 3

1969 – 1975

**Lloyds Bank California**, Vice President, Corporate and California Divisions

Responsible for the administration and development of major corporate relationships. Developed new lending programs including acceptance and SBA financing.

Additionally, Mr. Tarter was a founding organizer of Hancock Savings Bank. He shared responsibility for its formation, organization and co-organized its initial stock offering.

**TESTIMONY**:

Mr. Tarter has provided expert testimony at deposition and trial in municipal, state and federal courts as well as at arbitration.

Litigation and consultation clients include: Bank of the West, Mobil Oil Corporation, Ford Motor Credit Corporation, CNA, Credit First Bank, Republic Bank, Sanwa Bank, Citicorp, Deutsche Bank, CUMIS, FDIC, as Receiver, Harvard University, JPMorgan Chase, Wells Fargo Bank, Union Bank of California, Washington Mutual, Bank of Saipan, United Mortgage, Small Business Administration, as well as individuals, municipalities, partnerships and businesses.

**BOARD MEMBERSHIPS AND BUSINESS AFFILIATIONS INCLUDED**:

Western States Bankcard Association
Sunshine Makers, Inc. d/b/a Simple Green
Fort Ord Credit Union
Holiday World RV
Marin Outdoor (Bankruptcy related directorship)
First Alliance Mortgage Company (Appointed during bankruptcy proceedings)
American Standard Development Company, Inc.
BKLA Bancorp
Center Financial
Los Angeles Bankruptcy Forum
Los Angeles Business Council, member of Executive Committee
Loyola Marymount University Fine Arts/Film School Council
Los Angeles Free Net, Inc. (Internet)

**MEDIATOR**:

Mr. Tarter has been appointed by the United States Bankruptcy Court – Central District of California to its panel of mediators (1996 - present).

**Addendum to CV of Thomas A. Tarter**

Qualifications:   My background involves experience with large and small banks.   Lloyds Bank California, Sanwa Bank of California and First Los Angeles Bank were subsidiaries of very large banks.   At Sanwa Bank and First Los Angeles Bank, I was involved in evaluating potential acquisitions that involved "healthy" and "distressed" banks. At First Los Angeles Bank, I was also involved in the purchase of loans from the F.D.I.C. and the sale of non-performing loans.

I was also involved in the formation of a savings bank and a commercial bank that were located in Los Angeles, California.   While I did not serve on the board of directors of the savings bank, I provided advice involving staffing, capital and regulatory issues to directors and senior management.   I was involved in the formation of a commercial bank – Bank of Los Angeles.  At the Bank of Los Angeles, I was involved in the acquisition of another bank that was closed by state and federal regulators, purchased loans from the FDIC and the RTC.   Issues involved in the acquisition included: deposit retention, deposit withdrawal requests, possible run on deposits, liquidity, borrower loan defaults and lender liability claims, performing and non-performing loans.   It was a complicated process that worked out positively because well-defined business and strategic plans were quickly developed and implemented.

I was also approved by regulatory agencies to serve as the chief executive officer of a financially troubled bank, Center National Bank. This assignment resulted in the identification of significant additional problems within the bank that prior to my employment had not been CUSCed by either the bank's independent auditors or by the regulators.   My duties included: Securities and Exchange Commission disclosures, valuation of the loan portfolio, amendment of financial reports, the sale of loans, shrinkage of deposits, capital infusion and implementation of new policies, procedures and controls.

Subsequent to First Alliance Mortgage Corporation ("FAMCO") filing for bankruptcy protection, I was approved and appointed with the concurrence of the board of directors, creditors and court to the board of directors of FAMCO which was a public, SEC reporting financial services company.   I served during bankruptcy proceedings as its Audit Committee, Chair. I was also appointed to serve during reorganization on the board of directors of a regional retail company.

I have served as a director of the Western States Bankcard Association and as an advisor to various financial institutions and companies involving credit card, lender liability, TILA, and UDAP issues.

I have also been appointed to the panel of mediators by the United States Bankruptcy Court for the Central District of California.

**EXHIBIT B**

**List of cases that the expert witness has testified at trial, deposition, mediation or arbitration included the following:**

1. Kim vs Wilmington Trust, PHEAA, et al; San Diego, CA, Depo 2/18;

2. Yin vs Frontier Communications, et al, Los Angeles, CA, Depo 02/18;

3. Lafkas vs Lafkas, Los Angeles, CA, Depo 01/18;

4. Karapetyan vs US Bank, et al., Los Angeles, CA, Depo 01/18;

5. Robbins vs CitiMortgage, et al., San Francisco, CA, Depo 12/17;

6. TGV vs Conner, et al., Santa Ana, CA, Depo 12/17;

7. Manantan vs. Wells Fargo Bank, et al.., San Mateo, CA, Depo 11/17; Trial 2/18;

8. Favero, et al. vs. Stefanelli, et., et al., Colusa, CA, Depo 10/17;

9. GemCap, et al vs. Amalfi Capital, et al., Los Angeles, CA Depo 10/17;

10. Fredrickson vs Cannon Federal Credit Union, Albuquerque, NM, 06/17;

11. PHH vs Barrett, Daffin, et al., San Francisco, CA, Epo 6/17;

12. Al-Naswari vs FCI, et al, Santa Ana, CA, Depo 3/17 and 06/17;

13. US Trust, et al vs Aroyan; et al, Irvine, CA; Arb, 01/17;

14. Weiss, et al vs Citibank; Los Angeles, CA; Depo 12/16;

15. Steiner vs Bank America. Bank New York Mellon, Bayview, et al; San Francisco, CA; Depo 11/16;

16. Krumpholtz vs Redondo Beach Board of Education; Los Angeles, CA, Trial 10/16;

17. Middleburg Bank vs Torus Law, et al; Richmond, VA, Depo 09/16; Trial 11/16;

18. Community Bank of Santa Maria vs Joni Gray; Santa Barbara, CA, Depo 07/16;

19. Dias vs PNC, et al, Auburn, CA, Trial 03/16;

20. Data Label vs California Bank and Trust, Los Angeles, CA, Depo 3/16; Trial 03/17

21. Bresee vs Wells Fargo, et al, Phoenix, AZ, Depo 03/16;

22. Herrera vs AllianceOne, San Diego, CA; Depo 02/16;

23. Banneck vs Experian, HSBC, et al, Oakland. CA; 02/16;

24. Bodecker vs JPMorgan Chase, San Francisco, CA; Depo; 02/16;

25. Boston Private Bank vs. Foster Enterprises, et al., Depo, San Mateo, CA, 12/15;

26. Lawrence vs. J.D. Byrider, et al., Akron, OH, Arb. 12/15;

27. Jackson, et al vs. J.D. Byrider, et al., Cleveland, OH, Arb. 12/15;

28. People vs. Johnson, Santa Rosa, CA, Trial 8/15;

29. Kim vs BMW FS, et al., Los Angeles, CA, Trial 8/15;

30. Stansell vs Bank of America, et al., Marysville, CA, Depo 8/15;

31. Csmeezy, Inc. vs City National Bank, et al., Beverly Hills, CA, Depo 7/15;

32. Teamcare, et al. vs Wells Fargo Bank, et al., Los Angeles, CA, Depo 6/15;

33. Drakopoulos vs Credit Suisse, SPS, et al., Newberryport, MA, Trial 06/15 and 01/16;

34. Valdes, et al. vs Citibank, et al., Los Angeles, CA, Depo 05/15, 6/15; Trial 8/15;

35. Guerra, et al., vs Nationstar, et al., Sacramento, CA, Depo 04/15;

36. In re Tayyar, et al., Los Angeles, CA, Depo 04/15; Trial 05/15;

37. Gustafson vs. SST, et al, Los Angeles, CA, Depo 03/15;

38. Thomasian vs Wells Fargo Bank, et al.   Portland, OR,   Depo  03/15;

39. MCWE vs Compass Bank, et al, San Diego, CA , Depo 02/15; Trial 8/15;

40. In re Duncan and Dirk, et al., Los Angeles, CA, Trial 12/14;

41. Morvant vs Eastern Savings Bank, et al, Salt Lake City, UT, Depo 11/14; Trial 12/16;

42. Raima vs Wells Fargo Bank, Los Angeles, CA, Arb, 10/14;

43. In re Laube, et al., Woodland Hills, CA, Trial 10/14;

44. Linza vs PHH Mortgage, et al, Marysville, CA, Trial 07/14;

45. Corona, et al vs Heritage Oaks Bank, et al., Santa Barbara, CA, Depo 07/14; Trial 09/14;

46. Capil vs Mega Life, et al., San Jose, CA, Depo 06/14;

47. In re AJK Gadsen vs Sovereign Bank, et al, Woodland Hills, CA, Depo 05/14; Trial 06/14;

48. Carrillo vs Chase, et al,  Riverside, CA, Depo 04/14;

49. UGS vs Pacific Shores, San Jose, CA, Depo, 04/14;

50. In re Fox, Santa Ana, CA, Trial 01/14;

51. Squatrito vs CSS, Chatsworth, CA, Trial 01/14;

52. In re Hargett, Santa Ana, CA, Trial 01/14;

53. In re Gonzalez, Santa Barbara, CA, Trial 12/13;

54. LWL Investments, LLC vs Universal Bank, et al., Los Angeles, CA, Depo 11/13;

55. Indymac Ventures, LLC vs Anyia, et al., Los Angeles, CA, Depo 10/13; Arb 10/13;

56. Peters vs Discover, et al., Los Angeles, CA, Depo 9/13;

57. In re Kerr, et al, San Diego, CA, Trial 06/13;

58. In re Bacino, FDIC, as Receiver for La Jolla Bank vs Birger Greg Bacino, San Diego, CA, Trial 06/13;

59. Laurelwood Group, LLC vs. East West Bank, et al., Los Angeles, CA, Depo 05/13;

60. Verdiyan vs Capital One, et al, San Francisco, CA, Depo 04/13;

61. In re: Ortega, Santa Barbara, CA, Trial, 3/13;

62. Bacarti vs JPMorgan Chase, et al, Los Angeles, CA, Depo 3/13;

63. Kim vs JPMorgan Chase, et al, Los Angeles, CA, Depo 3/13;

64. Chang and Wong vs. Hanmi Bank, et al., San Jose, CA, Depo 2/13, Trial 06/13;

65. Downs, et al vs. Wells Fargo Home Loan, et al., Reno, Nevada, NV, Depo 1/13;

66. Gaudie vs Countrywide, et al., Chicago, IL, Depo 12/12;

67. Evans vs Trope, et al, Los Angeles, CA, Depo 11/12;

68. Khazra vs Shayan, Los Angeles, CA, Trial 10/12;

69. FDIC as Receiver for Union Bank, N.A. vs Prudential, et al., Phoenix, AZ, Depo 8/12;

70. FDIC as Receiver for La Jolla Bank vs O'Connor, et al., San Diego, CA, Depo 7612;

71. The Preserve, LLC vs Centerpoint, et al,. Los Angeles, CA,  Depo 05/12;

72. Valencia Dodge vs Mikaelyan, Chatsworth, CA, Depo 04/12; Trial 10/12;

73. In re: Krishan, LLC, San Jose, CA, Trial 04/12;

74. Shoreline vs. Union Bank of California, Los Angeles, CA, Depo 04/12;

75. Utah First Federal Credit Union vs. Federal Insurance, et al., Salt Lake City, UT, Depo 02/12;

76. Lopez, et al., vs. Wells Fargo Bank, et al., Los Angeles, CA, Depo 02/12;

77. Anderson vs. Chase, et al., San Diego, CA, Depo 01/12;

78. United States vs. Sutherland, et al., Las Vegas, NV, Trial 01/12;

79. Dillon vs. Chase, et al, Charleston, WV, Depo, 12/11; Trial 02/12;

80. Triano vs. Summit Bank, et al, Oakland, CA, Depo 11/11;

81. Wells Fargo Bank vs White, Los Angeles, CA, Depo 11/11; Trial 05/12

82. Oxford Street Properties, LLC vs. Lance Robbins, et al, Depo 10/11;

83. In re: Tarkanian, et al,. San Diego, CA, 09/11;

84. Mueller vs Wells Fargo Bank, San Francisco, CA, Trial 09/11;

85. Amezcua, et al vs. East West Bank, San Jose, CA, Depo 08/11; 09/11;

86. In re: The Preserve, LLC, Los Angeles, CA, Depo 08/11; Trial 08/11 and 10/11;

87. Kim, et al vs. CCU, et al, Las Vegas, NV, Depo 07/11;

88. Jacob vs. SDG&E, San Diego, CA, Mediation, 06/11;

89. TomatoBank vs East West Bank, Los Angeles, CA, Depo 07/11;

90. Held vs. Gilmore Bank, Santa Ana, CA, Depo ,06/11; Trial 07/11;

91. Trapasso and Justice vs Romero, et al, Stockton, CA, 05/11;

92. In re: Pacific Allied, Los Angeles, CA, Trial 03/11

93. Price vs Eller, et al. Riverside, CA, Trial 03/11

94. John Doe vs Church of Latter Day Saints, et al; Los Angeles, CA, Depo 02/11

95. Empire Merchandizing vs. Bank Rhode Island, Providence, Rhode Island, Depo 02/11; Trial 02/11.

96. United States of America vs. 718 West Wilson, et al, San Diego, CA, Depo 01/11

97. Dufour vs. Informative Research, et al, Garden Grove, CA, Depo 01/11

98. Amex vs Alexander Max, et al, Rockville, MD, Depo 10/10

99. Umpqua Bank vs Larmont, et al, Sacramento, CA, Depo 10/10

100.    In Re:  Mammoth Arrowhead 1, LLC, Phoenix, AZ, Trial 09/10

101.    D. Alexander vs Anderson, et al, Los Angeles, CA, Depo 08/10

102.    In re: Quarry Pond, LLC, et al, San Francisco, CA, Trial 06/10

103.    Abdi vs Mulhearn, et al, Los Angeles, CA, Arb 06/10;

104.    Lovett vs Citibank, et al, Los Angeles, CA, Depo 05/10; Trial 10/10; 5/12

105.    Charon Solutions, Inc. vs Jensen, et al, Los Angeles, CA, Depo 05/10

106.    Faye Estates, LLC vs Eastern Savings Bank, Los Angeles, CA, Depo 04/10; Trial 04/13

107.    Zey vs Dyck-O'Neal, et al, St. Louis, MO, Depo 04/10

108.    In re: Mendoza, et al, Santa Rosa, CA., Trial 04/10

109.    In re: Bacchus, et al, Santa Ana, CA, Depo 02/10; Trial 02/10

110.    Matthews vs Chase, et al, Jacksonville, FL, Depo 02/10

111.    DeWitt vs Monterey Insurance company, et al., San Diego, CA, Depo 02/10; Trial 04/10

112.    Jung vs Hamni Bank, et al., Los Angeles, CA, Depo 01/10

113.    Garcia vs Triton Acceptance, Los Angeles, CA, Depo 12/09; Trial 12/09

114.    CNA, et al vs Lloyds, et al, Chicago, CA, Depo 11/09

115.    Hickerson vs Financial Freedom, et al, Ventura, CA Depo 11/09; Trial 09/11;

116.    Perry vs Mega Life, et al., Phoenix, AZ, Depo 11/09

117.    In re: McBride's RV Storage, LLC., Riverside, CA, Depo 10/09; Trial 10/09

118.    Cartwright vs CMI, WSFS, Experian, et al. Los Angeles, CA, Depo 09/09; 10/09; 12/09

119.    Miller, et al vs. Norton Financial, Greer, Safe Harbor Financial, et al. San Diego, CA, Depo 09/09; Trial 05/10

120.    Petty vs Petty, Jackson, CA, Trial 08/09

121.    Marcus vs Vorspan, et al, Los Angeles, CA, Depo 07/09; Arb 08/09

122.    Hwang vs Fang Fashion, et al, Los Angeles, CA, Depo 06/09

123.    Elie vs Smith, San Mateo, CA, Depo 06/09

124.    In re Waterstone, LLC, et al, Reno, NV, Trial 06/09

125.    Heil Construction, Inc., vs Security Pacific Bank, et al., Bakersfield, CA, Depo 05/09

126.    UJV, et al vs Lewis, Jennings, Ross, et al. Grand Rapids, MI, Depo 02/08; Trial 04/09

127.    Blackburn vs. Duckor, et al, San Diego, CA, Dep 03/09; Arb 03/09

128.    Holly Young vs Bigelow, Los Angeles, CA Depo 03/09; Trial 06/09

129.    Levenson vs WaMu, et al., Los Angeles, CA, Depo 01/09; Arb 05/09

130.    Drury - Countrywide, et al., Tampa, FL, Depo 10/08

131.    Karen Cappuccio vs Countrywide, et al, Philadelphia, PA, Trial 09/08

132.    Mark Anderson vs WaMu, et al, San Diego, CA, Depo 09/08

133.    Ellis vs PHEAA, KeyBank, et al, Los Angeles, CA, Depo 07/08

134.    Quinn vs Cherry Lane Auto, et al, Spokane, WA, Trial 06/08

135.    In re I-5 Social Services Corporation, Debtor, Fresno, CA, Depo 05/08

136.    Walsh et al vs Bank of Petaluma, et al, Santa Clara, CA, Depo 04/08; Trial 09/08

137.    Gorman vs HSBC, Experian, et al, New York, NY, Depo 04/08

138.    Shokatz vs Better Business Financial Services, Kelly Lucas & Pacifico LLP, et al, Milwaukee, WI, Depo 03/08

139.    Austin vs HSBC, et al, San Diego, CA, Depo 03/08

140.    Melton vs Friend, et al, Santa Ana, CA, Depo 01/08

141.    OES vs West Coast Bank, et al, Portland OR, Trial 01/08

142.    Michigan First Credit Union vs CUMIS, et al, Detroit MI, Depo 12/07; Trial 01/09

143.   Ligon vs Chase, et al, Dallas, TX, Depo 11/07

144.   Williams vs. AutoNation, Los Angels, CA, Depo 11/07; Trial 12/07

145.   Weldon vs. Launch Marketing Concepts, Inc., Los Angeles, CA, Depo 11/07; Arbitration 12/07

146.   Arnold vs LNR, Los Angeles, CA, Depo 10/07

147.   Squirty's Collision, et al vs Finishmaster, et al, Depo 09/07; Trial 09/07

148.   Casey vs US Bank, et al, Santa Ana, CA, Depo 09/07; Trial 10/07

149.   Nardelli vs MetLife, et al, Phoenix, AZ, Depo 09/07; 08/08; Trial 03/09

150.   Cha, et al vs WFB, et al, Los Angeles, CA, Depo 08/07; Trial 09/07

151.   Ho, et al vs Wells Fargo Bank, et al, Los Angeles, CA, Depo 08/07; Trial 08/08

152.   Ott vs Markley Group, et al, Los Angeles, CA, Depo 06/07

153.   Hayden vs. Hayden, Los Angeles, CA Arbitration 05/07

154.   Nelson vs. Arrow Financial Services, et al, Los Angeles, CA, Depo 04/07; Trial 05/07

155.   Foppiano vs. Union Bank of Stockton, et al, Sacramento, CA, Depo 04/07

156.   Board of Health Dept vs Virginia Jefferies, et al, Mansfield, OH, Depo 04/07

157.   DeLuna vs Bank America, Los Angeles, CA, Depo 12/06; Trial 06/07

158.   Pertiera vs Bank America, Los Angeles, CA, Depo 12/06

159.   United States vs. Flores, Los Angeles, CA, Trial 12/06

160.   Lehman vs Net Bank, et al, Indianapolis, In, Depo 12/06

161.   Kay vs. Washington Mutual, et al., Sacramento, CA, Depo 09/06

162.   Loudd vs. Weston, Conseco, GreenTree, et al., Los Angeles, CA, Trial 09/06

163.   Associated Bank, et al vs Brady Martz, Minneapolis, MN, Dep 0906

164.   Satey vs Chase Manhattan Bank, et al, Los Angeles, CA, Dep 08/06

165.   1124 Marylin Drive Development, LLC vs Elyaszadeh, Los Angeles, CA, Dep 04/06; Trial 07/06

166. Paradigm Industries, Inc. vs Yang, Wells Fargo Bank, et al., Los Angeles, CA, Dep 03/06; trial 04/06

167. Bank of America vs Mark Guzy, et al, San Francisco, CA, Dep 03/06

168. First State Bank of Taos, et al. vs Close, Albuquerque, NM, Dep 02/06

169. Neumann, et al. vs. Friedland, et al, San Jose, CA, Dep 02/06

170. Babijian, et al vs Union Bank of California, Los Angeles, CA, Dep 01/06

171. Bistro Executive, Inc., et al, vs Rewards Network, Inc., et al, Dep 01/06

172. Lu, et al, Los Angeles, CA, Arbitration, 11/05

173. Fisher vs Wells Fargo Home Mortgage, et al, Los Angeles, CA Dep 11/05, Trial 04/07

174. Turner vs Washington Mutual, et al, Los Angeles, CA Dep 11/05

175. Accurate Air Engineering vs Bank of America, Los Angeles, CA, Dep 11/05

176. Las vs Washington Mutual, Las Vegas, NV, Dep 09/05, Arbitration 01/06

177. Dante Valve Company, Inc, et al vs Bank of America, Los Angeles, CA, Dep 08/05

178. Amada America, et al vs Bank of America, Los Angeles, CA, Arbitration, 05/05

179. Green vs Vars, et al, Los Angeles, CA, Dep 04/05

180. White vs White, et al, Riverside, CA, Dep 03/05

181. Sherman, Abrunzo vs Stricklands, Aaron & Jacqueline and Estate of Albert Thompson, et al, Chatsworth, CA, Trial 02/05, No. PC 033244-V

182. Harman vs California Federal Bank, et al, Van Nuys, CA, Dep 1/05, Trial 2/05, No. LC059430

183. Reizian vs Mehrdad Arya, Global Capital Group, Inc,, The Escrow Group, et al, San Diego, CA, Trial 02/05, No. GIC 819536

184. Barry vs California Bank and Trust, et al, Orange County, CA, Dep 01/05, No. 04CC04393

185. Norma Berneman, et al vs. Ira Shear, Bank of America, et al, Los Angeles, CA, Dep 9/04 BC 278 601

186. Invelj, Inc. vs AMK Management, Inc., et al, Van Nuys, CA, Trial 07/04 02E08010

187.    Federal Insurance Corporation and Plum Creek Marketing, et al vs Bank America, Cal Fed, et al, Ventura, CA, Dep 06/04 CIV 215700

188.    Barbara San Martin vs. Antioch Credit Union, Martinez, CA, Dep 05/04

189.    Humbolt Bank, et al  vs Gulf Insurance Company, San Francisco, CA, Dep, 05/04 C03-1799 SC ARB

190.    Vasquez, et al vs Beneficial Finance, Portland, OR, Trial 01/04

191.    United Grand vs Farmers & Merchants Bank, et al, Long Beach, CA, Dep 01/04, No. BC296270

192.    Commercial Programming Systems, Inc. vs Briggs & Baker, et al, Los Angeles, CA, Dep 12/03; Trial 02/04

193.    Ferrera vs Henry C. Hansel, Inc., et al, Santa Rosa, CA, Dep 12/03, No. 231480

194.    Beach, et al vs Bank of America, et al, San Francisco, CA, Dep 11/03

195.    Aquino vs Providian, Fresno, CA, Madera County No. CV18758, Dep 10/03

196.    Martinez vs Onyx Acceptance Corporation, et al, Fresno, CA, Trial 8/03

197.    FFS, et al vs Bank of Saipan, Abilene, TX, Dep 7/03; Trial 04/05

198.    SoCal Housing Partners, LLC vs Gregory S. Hancock, Darrell Hoover, et al, Los Angeles, CA, Depo 6/03

199.    Anthony Kalajian vs. Patricia Dubon, Aames, et al, Los Angeles, CA, Dep 5/03

200.    Wells Fargo Bank vs Peter Knibb, et al, Los Angeles, CA, Dep 5/03

201.    Spectrum Glass and Aluminum, Inc., et al vs People's Bank of California, et al, Los Angeles, CA, No. EC – 033501, Dep 3/03

202.    Nilchin vs Cohen, et al, Los Angeles, CA, Trial 3/03

203.    Luther vs Bank of America, Moreno Valley Honda, et al, Riverside, CA, Dep 01/03

204.    Corbett vs Bank of America, Hayward Dodge, et al, Oakland, CA, Dep 11/02, 12/02

205.    Costa vs Fresno Surgery Center, et al, Fresno, CA, Dep 10/02; Trial 11/02

206.    Bank of America, et al vs Prime One Capital, Bridgeport, CN,  Federal Court, Trial 10/02

207.    California Federal Bank vs Russell Crawford, et al, Los Angeles, CA, No. BC – 144590, Trial  9/02

208.   INET Interactive Network System, Inc., Debtor-in-Possession, Plaintiff, vs Global Crossing Bandwidth, Inc., fka Frontier Communications of the West, Inc., Defendant, No. LA 01-13671-KM, Dep 9/02

209.   Alaska Petroleum Environmental Engineering vs Antiquarian Traders, et al, Los Angeles, CA, No. LASC BC 260006, Trial 8/02

210.   Global Interactive Marketing, et al. vs Joseph Clark, United Nevada Trade International, et al., Los Angeles, CA, No. SC 059148, Dep 7/02, Trial 3/03

211.   Grumbo vs Bretz, Los Angeles, CA, No. SC 059095, Dep 7/02

212.   Sam Carroll and GOCO Acquisition Corp. vs German American Capital, et al., Birmingham, AL, No. 01-T-981-5, Federal Court, Dep 6/02

213.   Duran vs. Citicorp, Santa Clara, CA, No. CV-790369, Dep 6/02

214.   Fyke and Falcone vs. Screen Shop, Santa Clara, CA, Trial 5/02

215.   Bill's Quik Stop vs West America Bank, et al., Fresno, CA, Dep 5/02

216.   Krantz vs Philpott, et al., Los Angeles, CA, Dep 1/02

217.   Bank of America vs San Ramon Carriage Co., Inc., et al, Contra Costa County, CA, No. C00-04854, Dep 10/01; Trial 11/01

218.   David Kim vs California Korea Bank, No. BC108719, Los Angeles, CA, Trial 8/01

219.   Spring Mountain Homes, et al vs Upland Bank, American Arbitration Association No. 72-110 00981, Upland Bank - MJE, Los Angeles, CA, Arbitration 8/01

220.   Viva Tiger, Inc. vs Cathay Bank, Pasadena, CA, Dep 6/01, Trial 7/01

221.   Marine Village Townhomes Association vs Hawthorne Savings and Loan, No. YC 032 949, Los Angeles, CA, Dep 5/01

222.   Abatti vs Floyd, et al, Imperial, CA; SC case No. 89994Dep 3/01, Trial 5/01

223.   Lee vs Bank of America, Los Angeles, CA; Dep 1/01, Trial 2/01

224.   EIE Guam Corporation vs The Long Term Credit Bank of Japan, Ltd., et al., United States District Court of Guam, Territory of Guam, No. 00-00009; Dep 11/00; 12/00;

225.   In re:  Cimms, et al, Los Angeles, CA

226.   Kroupa vs Sunrise Ford, AT&T, et al, Los Angeles, CA; ECO 14965, Trial 11/00

227.   Reyes vs Car Gallerie, et al, United States District Court, Los Angeles, CA;  CV -00-5673-MWB; Trial 10/00

228.   Bank of America vs Larry Whithorn; Riverside, CA, RIC 310840; Dep 9/00

229.   Kane vs Capital One, et al; GIC733574; San Diego, CA; GIC 733574; Dep 8/00

230.   Larry Nix, et al vs Westcorp, et al.; Los Angeles, CA; BC 204188; Dep 8/00

231.   Coast Business Credit vs Roger Hay, Ken Campbell, et al.; Orange County Superior Court; No. 787394; Dep 5/00

232.   Hanna vs American Dream Equity Home Loan Corporation; Los Angeles, CA; EC026426;    Dep 2/00

233.   Life Benefactors, LP vs Transamerica, et al;  San Diego, CA;  723176;  Dep  1/00;  Trial 3/00

234.   Peter Ligeti vs Advanta National Bank;  Santa Clara, CA;  CV 770626;  Dep 11/99

235.   Ambriz, et al vs Greentree Financial;  Elko, NV;  #29128;  Dep 10/99;  Trial (A) 11/99

236.   In re: Nellis Arms Apartments;  Las Vegas, NV;  99-12278 LBR;  Dep 9/99;  Trial 9/99

237.   B&B Sons Enterprises, Joseph and Nancy Benvenuti vs La Salle National Bank, et al; Sacramento, CA;  # 74-Y148-0181-98;  Dep  6/99;  Trial (A)  6/99

238.   Davina Willis vs J. G. Wentworth SSC;  San Francisco, CA;   Dep  8/99

239.   Davis vs A&L, et al;  Riverside, CA;  273753;  Dep  6/99

240.   In re:  Crystal Properties, Ltd;  San Fernando Valley, CA;  SV 97-18796-KL; Dep 5/99; Trial  7/99

241.   In re:  Maroa Park Apartments;  Modesto, CA;  98-95624-A-4;  Dep 6/99;  Trial  8/99  `

242.   Ohai vs WHC-Three Investors, The Archon Group, et al;  Los Angeles, CA; AAA Case No 72-1480039098;  Trial (Arbitration)  3/99

243.   Florence, et al;  Las Vegas, NV;  Dep  1/99

244.   Ambassador Hotel Co. LTD vs Wan Yuan Lin, et al;  Los Angeles, CA;  No 176479; Dep  2/99

245.   Wendell vs Wells Fargo Bank; San Francisco, CA;  983597;  Dep 4/99

246.   Bragg vs Hawthorne Savings Bank;  Los Angeles, CA;  Trial  11/98

247.   Rosario Sobremonte; Amparo Esperidion, et al vs Bank of America;  Los Angeles, CA; BC 127133;  Dep 9/98

248.    Finnocario, et al vs Wells Fargo Bank, et al, Los Angeles, CA, Depo est 09/98

249.    Yang, et al vs Bank of America;  Los Angeles, CA;  Los Angeles;  VC 020377;   Dep 3/98 est

**250.**   EMC Mortgage Co., et al vs Christensen, et al;  Fresno, CA;  Trial 2/97 est

251.    Fuchs and Marshall, et al vs Hwai-Tang Chen, et al ;  Santa Monica, CA;  SC047845;  Trial 11/98 est

252.    Union Oil Company of California vs Mobil Oil;  Los Angeles, CA;  Dep 10/98est;  Trial 11/98 est

253.    Tillman Fabric, Inc vs New Progress Enterprise Co., et al;  Los Angeles, CA;  BC 161449;  Trial   7/98

254.    Budak vs Grossman;  Los Angeles, CA;  Dep --/97 est;  Trial (Arbitration)  --/98

255.    Imperial Bank vs Robert Selan, et al; Los Angeles, CA;  LC038665;  Dep --/98 est

256.    Sukow vs Republic Western Insurance Company, et al;  Los Angeles, CA;  BC 142792;  Dep --  /98 est

257.    In re. Silveira, et al;  Modesto, CA;  96-92575;  Trial  11/96

258.    In re. Playa Pacifica, et al;  Santa Ana, CA;  SA96-11937-JW;  Dep 10/96

259.    Federal Deposit Insurance Corporation vs BMB Properties, et al: Los Angeles, CA;  C 669033 consolidated into C 669294;  Dep 8/97;  Trial 9/97

260.    Quiter/Nikkel vs Watsonville Cogeneration Partnership, State Street Bank and Trust Company of California and Ford Motor Credit Company, et al;  San Francisco, CA;  969360;  Dep 5/97;   Trial   6/97

261.    Takaki vs Hawthorne Savings Bank;  Los Angeles, CA;  YC 021815 Dep  4/97 est. and 2/99;  Trial  6/97 and 3/99

**262.**   The Official Oversight Committee vs Levene & Eisenberg, Alliance Bank, et al; Santa Barbara, CA;  213552;  Dep  10/97

263.    Bilma Sadah vs Wells Fargo Bank, Chemical Bank, et al  Los Angeles;  YC 025096;  Dep 10/98 est;  Trial 3/99

264.    Kertesz vs Home Savings of America;  Santa Monica, CA;  SC 037986;  Dep  9/97

265.    O.T. vs Valle Verde Foods; Los Angeles, CA; Trial (Arbitration) 11/97 est

266.    Monarch Bank, et al; Santa Ana, CA; Dep 6/97

267.    Patel vs Pacific Inland Bank; Los Angles, CA; LC 018345;  Dep 97 est

268.    Hughes vs Home Savings Association, et al; Santa Barbara, CA; 211477; Dep 1/97;
Trial 3/ 97

269.    Beck Oil, Inc vs Bank of America; Los Angeles, CA;  Dep 2/97;  Trial 3/97

270.    In re: Hansohl, Inc., et al; Los Angeles, CA;  Dep  1/97

271.    Tokai Bank of California vs KSS Real Estate Group, et al;  Los Angeles, CA;
BC131203;    Trial 6/96

272.    Powertrain, et al vs Haifa; Santa Ana; CA;  Trial  7/96est

273.    In re: Maulhardt Industrial Center; Santa Barbara, CA; ND 95-15475-RR;  Trial   5/96

274.    Guny vs Lieb, et al;  Ventura, CA;  114052;  Trial --/96

275.    Tillack & Co., Ltd vs Diane Tubergen, Wells Fargo Bank, The Sanwa Bank of
California, et al BC   058825; Los Angeles, CA; Dep --/94;  Trial (Arbitration) 4/96 est

276.    Timmothy Watson vs The Downey Venture, et al; Los Angeles, CA;  BC   098430; Dep -
-/96 est

277.    Farnon vs World Savings, Santa Monica Bank, Argus, et al;  Los Angeles, CA;  LC
022237;  Dep 5/95:  Trial  7/95

278.    First American Title Company vs Bank of America, et al;  Los Angeles, CA;  BC
098416  Dep est. 1995

279.    Hanmi Bank vs Kim, You, et al;  Los Angeles, CA;  Dep  --/95

280.    Mosely vs Farmers and Merchants Bank; Los Angeles, CA;  NC 012950; Dep --/95 est

281.    Pelletier vs Behrens, et al; Los Angeles, CA;  CV  890969-RMT   Dep est 1995; Trial
11/99

282.    In re. Gatway Properties, et al  and  The  Alicante Management Co, et al; Santa Ana, CA;
SA95-10963JR and 95-12694JR;  Trial est 95

The aforementioned list may be supplemented in the event that a matter(s) was inadvertently
omitted.  Dates have been estimated to the best of my recollection.

**EXHIBIT C**

DISPUTE INVESTIGATION AND RESOLUTION PROCESS

Source: CFPB 2017.

**The Andela Consulting Group, Inc.**
**18783 Tribune Street**
**Northridge, CA 91326**

Thomas A. Tarter
Managing Director
Expert Witness – Banking and Credit
Consulting – Financial and Management

Phone: (818) 380-3102
Cell: (818) 414-6685
E-Mail: ttarter@earthlink.net
Web: www.andelaconsulting.com

# EXPERT REPORT

**Christopher Shepard,**

**vs**

**Equifax Information Services, LLC, et al.**

**Case No:  2:17-cv-01118-KJM-CKD**

**United States District Court**

**Eastern District of California**

**March 8, 2018**

Prepared By

*Thomas A Tarter*

**Thomas A. Tarter**

1